CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

MAR 0 6 2009

JOHN F. CORCORAN, CLERK
BY: J. Bright
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

TERESA LEWIS,                          )
                                       )
        Petitioner,                    )        Civil Action No. 7:07CV00538
                                       )
v.                                     )        **MEMORANDUM OPINION**
                                       )
BARBARA WHEELER, WARDEN,               )        By: Hon. Glen E. Conrad
FLUVANNA CORRECTIONAL                  )        United States District Judge
CENTER FOR WOMEN,                      )
                                       )
        Respondent.                    )

On May 15, 2003, the petitioner, Teresa Lewis, pled guilty to seven offenses in the

Circuit Court of Pittsylvania County. The offenses included the capital murder for hire of her

husband, Julian Clifton Lewis, Jr., and the capital murder of her stepson, Charles J. ("C.J.")

Lewis. The Circuit Court sentenced Lewis to death for both capital murder convictions. After

unsuccessfully challenging her death sentences on both direct appeal and in state habeas corpus

proceedings, Lewis filed a petition for writ of habeas corpus in this court, pursuant to 28 U.S.C. §

2254. The petition is presently before the court on the respondent's motion to dismiss. For the

reasons set forth below, the court will grant the respondent's motion.

**Factual Background**

In affirming Lewis' sentences of death on direct appeal, the Supreme Court of Virginia

summarized the facts as follows:

> Julian Clifton Lewis, Jr., had been employed for several
> years by Dan River, Inc. His first wife, who had been ill for a long
> time, died in January 2000. In March or April 2000, Julian Lewis
> met the defendant, who was also employed by Dan River. The
> defendant began to live with Julian Lewis at his home in Danville
> in June 2000. Subsequently, Julian Lewis married the defendant.

In December 2001, Julian Lewis' older son, Jason Clifton Lewis, died in a car accident. Julian Lewis was the beneficiary of his son's life insurance policy, and Julian Lewis received proceeds in excess of $ 200,000. He placed those proceeds in a draft account with Prudential Securities, Inc. The proceeds of the account were accessible only by use of drafts bearing the signature of Julian Lewis.

In February 2002, Julian Lewis purchased a five-acre parcel of land in Pittsylvania County. He also purchased a mobile home and placed it on the property, where he and the defendant resided.

In August 2002, Julian Lewis' younger son, Charles J. Lewis, an Army reservist, was required to report for active duty with the National Guard in Maryland. According to Lieutenant Michael Booker, Charles Lewis' commanding officer, Lewis made estate arrangements in the event he died while on active duty. Charles Lewis executed a will and identified his father as his primary beneficiary and his stepmother, the defendant, as the secondary beneficiary. Charles Lewis obtained a policy of life insurance in the amount of $250,000 payable in the event of his death. He designated his father as the primary beneficiary of the life insurance policy and the defendant as the secondary beneficiary.

In the autumn of 2002, Rodney L. Fuller and Matthew J. Shallenberger met the defendant at a retail store. Prior to this meeting, the defendant did not know these men. After a conversation, Shallenberger and the defendant exchanged telephone numbers and began to communicate frequently. Shallenberger and the defendant discussed the possibility that Shallenberger, with Fuller's help, would kill Julian Lewis, and they would share any insurance proceeds that the defendant might receive.

One day, the defendant and her 16-year-old daughter, Christie Bean, met Shallenberger and Fuller at a parking lot in Danville. Christie, who had never met Fuller previously, had sexual intercourse with him in one car while the defendant and Shallenberger engaged in sexual intercourse in another vehicle. On a later date, Fuller and Shallenberger went to the defendant's home

2

where she performed a "lingerie show" for the men, and she had sexual intercourse with both men.

On October 23, 2002, the defendant met Shallenberger and Fuller at a shopping center in Danville. The defendant went to a bank and obtained $1,200 in cash that she gave to the men to use to purchase firearms and ammunition to kill Julian Lewis. Antwain D. Bennett, an acquaintance of Shallenberger, used the money to purchase three firearms. Two of the firearms were shotguns. Additionally, Bennett purchased ammunition for the weapons.

On that same date, the defendant told Shallenberger and Fuller the route that Julian Lewis traveled from his place of employment to his home. The men planned to kill Julian Lewis and "make the murder . . . look like a robbery." While the defendant remained at her home, the men were "to follow and stop Julian Lewis on the highway and kill him." The plan, however, was unsuccessful.

Consequently, the defendant, Shallenberger, and Fuller decided to kill Julian Lewis at his home on October 30, 2002. They also decided to kill his son, Charles Lewis, when he returned to Virginia to attend his father's funeral and share the proceeds from Charles Lewis' policy of life insurance. However, when the conspirators learned that Charles Lewis would be with his father at the mobile home on October 30, 2002, they decided to kill him and his father simultaneously.

During the early morning of October 30, 2002, Shallenberger and Fuller drove a vehicle past the Lewis' home about three times. The men did not stop their vehicle because they observed that lights were on in the home. Eventually, Shallenberger and Fuller entered the residence through a rear door that the defendant had unlocked.[1] Each man carried one of the shotguns that had been purchased with the $1,200 cash the defendant had given them. Shallenberger and Fuller awakened the defendant, who was in bed with her husband. Shallenberger told the defendant, "Teresa, get up." The defendant got out of her bed and walked into the kitchen, and she heard gunshots.

---

[1] The court notes that the record indicates that, in addition to leaving a door unlocked, Lewis made sure that the couple's pit bull was locked in an extra bedroom. (Direct Appeal Joint Appendix at 499, 556).

3

Shallenberger shot Julian Lewis several times. The defendant went
to the bedroom where her husband lay bleeding, retrieved Julian
Lewis' pants and wallet, and returned to the kitchen with
Shallenberger.

Fuller entered a room that was occupied by Charles Lewis.
Fuller shot Charles Lewis three times. Then Fuller went to the
kitchen where he observed the defendant and Shallenberger
"pulling money from a wallet." Fuller told the defendant and
Shallenberger that Charles Lewis "wouldn't die." Fuller got
Shallenberger's shotgun and returned to the bedroom occupied by
Charles Lewis where Fuller shot him two more times. The men
retrieved most of the shotgun shells, and they divided $300 in cash
that had been taken from Julian Lewis' wallet.

After shooting the victims, Shallenberger told the defendant
that he was sorry she "had to go through something like this;
hugged her and kissed her; and the men left." The defendant
waited about 45 minutes after the "last shot was fired," and she
made a telephone call to her former mother-in-law, Marie Bean.
Next, she made a telephone call to her best friend, Debbie Yeatts.

On Wednesday morning, October 30, 2002, approximately
3:55 a.m., the defendant placed a telephone call to emergency
response personnel in Pittsylvania County. She reported that an
intruder had entered her home and shot her husband and his adult
son. She stated that both men were dead. She said that she had
been in the bed with her husband when an intruder armed with a
pistol entered her bedroom and said, "Get up." Her husband told
her to go into the bathroom, and her husband asked the intruder,
"What's going on?" The defendant said that her husband was shot
four or five times while she was in the bathroom. She reported that
the shooting had occurred at 3:15 or 3:30 a.m.

Sheriff deputies Harris Silverman and Corey Webb arrived
at the murder scene at approximately 4:18 a.m., 23 minutes after
the defendant made the telephone call to the emergency response
personnel. The deputies met the defendant at the front door of her
home, and she stated that her husband's body was on the floor in
one bedroom and that her stepson's body was in another bedroom.
When Deputy Webb entered the master bedroom, he learned that
Julian Lewis was alive. Julian Lewis "made slow moans" and
uttered, "Baby, baby, baby, baby." Deputy Webb asked the victim
his name, and he responded, "Julian." Deputy Webb asked Julian

4

Lewis if he knew who had shot him, and the victim responded, "My wife knows who done this to me."

While the deputies tried to assist the victims, Deputy Webb observed the defendant conversing on the telephone, and he heard her state, "I told C.J. [Charles Lewis] about leaving that back door unlocked." Julian Lewis died in his residence. When Deputy Webb informed the defendant that her husband and stepson were dead, she did not appear upset.

Investigator J.T. Barrett of the Pittsylvania County Sheriff's Office arrived at the murder scene approximately 7:00 a.m. on October 30, 2002. Barrett interviewed the defendant twice. Investigator Keith N. Isom also interviewed the defendant. During one of the interviews, the defendant claimed that her husband had physically assaulted her a few days before his death, and she denied knowledge of her husband's killer. She said that she would not kill her husband or have him killed.

Investigator Barrett asked the defendant what she and her husband did before they went to bed on the night of the murders. She said that she talked with her husband, and that they prayed together. She told her husband that she was going to pack his lunch, and he went to sleep. She prepared a lunch and placed it in the refrigerator. She wrote a note on the lunch bag that stated, "I love you. I hope you have a good day." A picture of a "smiley face" was drawn on the bag and inscribed in the "smiley face" was the message, "I miss you when you're gone."

Mike Campbell, Lewis' supervisor, testified that Julian Lewis did not use bags to bring his lunch to work. Rather, Julian Lewis took his lunch to work in a blue and white cooler.

Investigator Isom interviewed the defendant again on November 7, 2002. During this interview, the defendant admitted that she had offered Matthew Shallenberger money if he would kill her husband. After the interview, the defendant again spoke with Investigator Isom. The defendant told Isom that she had met her husband's killer at a retail store and that he was from New York. The defendant stated that she had "let him in" her mobile home, and he shot both Julian Lewis and Charles Lewis, took some money, and left. She told the investigator that she had agreed to give Shallenberger half of the insurance proceeds that she expected to receive, but she changed her mind and decided to keep all the

5

money.  She informed the investigator of Shallenberger's address, and Isom and the defendant went to Shallenberger's residence where she identified him.

On November 8, 2002, the defendant, who was in the Danville City Jail, requested to speak with Investigator Isom.  He interviewed her at the jail, and she told Isom that Rodney Fuller was also involved in the murders of her husband and stepson.  The defendant also stated that her daughter had assisted with the murders.  The defendant "acknowledged that after the shooting and after the men left the house [on the night of the murders], she had waited about thirty minutes to call 911."

On the day of the murders, the defendant made a telephone call to Campbell and told him that her husband had been killed, and that she wanted his paycheck.  Campbell informed the defendant that she could not retrieve the paycheck before 4:00 p.m. on that day.  The next day, October 31, 2002, the defendant again called Campbell and asked for Julian Lewis' paycheck.  Campbell responded that he could not give the paycheck to her.

Lieutenant Michael Booker, Charles Lewis' commanding officer, called the defendant to express his condolences early on the afternoon of October 30, 2002, the day of the murders.  The defendant told him, "I'm still in shock. The police had me in Chatham today, all in my face.  There is no way I would have killed my husband and stepson.  They guessed that because I didn't get shot that I might have done it.  My husband told me to go into the bathroom, so I did."  The defendant informed Booker that she was the secondary beneficiary on the life insurance policy of Charles Lewis, and that she wanted the insurance proceeds.

On November 4, 2002, the defendant called Booker by telephone and left a message for him because he was not available.  When Booker spoke to her later that day, the defendant asked him about Charles Lewis' personal effects.  Booker advised the defendant that she could not have them because she was not the beneficiary of Lewis' estate.  The defendant asked Booker whether she was still entitled to the life insurance proceeds in the amount of $250,000.  Booker told the defendant that she was, and she responded, "Well, Kathy [Charles Lewis' sister] can have all his stuff as long as I get the money."

6

Before the murders, the defendant told a woman, Debbie Anderson, that the defendant was just "using Julian for money and that he would buy her things." Bobby Demont, who had known Julian Lewis and the defendant for several years, heard the defendant say "a couple months before the murders" that if Julian died, "she would get the money, and if [Charles Lewis] was killed and Julian was dead, she would get that money, too."

The defendant told Kathy L. Clifton, Julian Lewis' daughter, that the defendant waited 45 minutes after the murders and then called her ex-mother-in-law, Marie Bean, and her best friend, Debbie Yeatts, before she "called 911 for help." On the day of the victims' funerals, the defendant told Kathy Clifton that the defendant had purchased a beautiful suit to wear to the funeral. The defendant asked Clifton, "You don't think I had anything to do with this, do you?" The defendant also offered to sell the mobile home and land to Clifton. After the murders, but before the funeral, the defendant made a number of statements in Clifton's presence to the effect that the defendant had ample money to pay for the funerals and that she would benefit financially because of the deaths of Julian Lewis and Charles Lewis.

After the murders, the defendant tried to withdraw $50,000 from Julian Lewis' account with Prudential Securities. The defendant appeared at a bank and presented a check, purportedly signed by Julian Lewis and made payable to her in the amount of $50,000. A bank employee refused to negotiate the check because the signature on the check did not match Julian Lewis' signature in the bank's records.

The deputy sheriffs searched a mobile home where Matthew Shallenberger and Rodney Fuller resided. Two shotguns were recovered from the residence and delivered to a forensic science laboratory for analysis. The shotgun shells recovered from the room where Julian Lewis was murdered were fired by one of the shotguns recovered from the mobile home where Shallenberger and Fuller lived. The deputies also found two pairs of rubber household gloves in a closet in Shallenberger's bedroom. Primer residue caused by the discharge of a firearm bullet or shell was present on the gloves.

7

Assistant Chief Medical Examiner Susan E. Venuti performed autopsies on the bodies of Julian Lewis and Charles Lewis. She determined that each man died as a direct result of multiple shotgun wounds. Julian Lewis suffered shotgun wounds to the upper left arm, shoulder, abdomen, pelvis, penis, thighs, legs, arms, and chest. The bullets destroyed or removed large areas of tissue in his upper arm, shoulder, and upper chest. The bullets also fractured several ribs. Plastic wadding from a shotgun shell was lodged in his left lung tissue. Julian Lewis eventually died from extensive blood loss.

Charles Lewis received a total of eight wounds from an undetermined number of discharges of a shotgun. He suffered wounds to his back, abdomen, chest, neck, left upper arm and shoulder, elbow, left thigh, face, and forearm.

Lewis v. Commonwealth (Lewis I), 593 S.E.2d 220, 222-225 (Va. 2004), cert. denied, 543 U.S. 904 (2004).

## **Procedural History**

Lewis was indicted by a grand jury in Pittsylvania County on November 20, 2002. The grand jury charged her with the following seven offenses: capital murder for hire of Charles J. Lewis, in violation of Virginia Code § 18.2-31(2); capital murder for hire of Julian Clifton Lewis, Jr., in violation of Virginia Code § 18.2-31(2); conspiracy to commit capital murder, in violation of Virginia Code §§ 18.2-22 and 18.2-31; robbery of Julian Clifton Lewis, Jr., in violation of Virginia Code § 18.2-58; use of a firearm to commit the murder of Julian Clifton Lewis, Jr., in violation of Virginia Code § 18.2-53.1; use of a firearm to commit the murder of Charles J. Lewis, in violation of Virginia Code § 18.2-53.1; and use of a firearm to commit the robbery of Julian Clifton Lewis, Jr., in violation of Virginia Code § 18.2-53.1.

On May 15, 2003, Lewis pled guilty to all seven offenses. Prior to accepting Lewis' guilty pleas, the Circuit Court considered a competency assessment prepared by Barbara G.

8

Haskins, M.D., a board-certified forensic psychiatrist. According to the assessment, Lewis'
cognitive testing revealed a full scale IQ of 72, a verbal IQ of 70, and a performance IQ of 79.
Although Dr. Haskins noted that such scores were indicative of borderline intellectual function,
Dr. Haskins opined that Lewis had the capacity to enter pleas of guilty to the pending charges,
that she had the ability to understand the potential penalties, and that she was capable of assisting
in her own defense. After considering Dr. Haskins' report, the Circuit Court thoroughly
questioned Lewis and concluded that her guilty pleas were made knowingly, intelligently, and
voluntarily. The Circuit Court also accepted the Commonwealth's written summary of the
evidence that the Commonwealth would have presented had the case proceeded to trial.

On June 2 and 3, 2003, the Circuit Court conducted Lewis' sentencing hearing. At the
hearing, Lewis' counsel presented the testimony of two witnesses, Eddie Rojas, a state probation
officer who began supervising Lewis in 2000 after she was convicted of forgery of a drug
prescription, and Bruce Hammock, a longtime family friend who was engaged to Lewis' sister.
Rojas testified that Lewis was still under his supervision at the time of the instant offenses, that
she had complied with all of the terms and conditions of her probation, and that she had not
demonstrated any form of violence. Likewise, Hammock testified that he had not seen Lewis act
in a violent manner. Lewis' counsel also introduced a letter from an official at the Roanoke City
Jail, where Lewis was incarcerated, which confirmed that Lewis had not received any
disciplinary infractions during her period of incarceration. Additionally, Lewis' counsel advised
the Circuit Court that Lewis' father, brother, and sister were in the courtroom, and that they

9

would all testify that "they love her and they care about her, and they don't want her to die." (Direct Appeal Joint Appendix at 377).[2]

After considering the evidence presented at the sentencing hearing and the written summary of the Commonwealth's evidence, the Circuit Court sentenced Lewis to death for both capital murder offenses. The Court found, as an aggravating predicate, that Lewis' conduct was outrageously or wantonly vile. See Virginia Code § 19.2-264.2 ("In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.").

On June 13, 2003, the Circuit Court conducted a post-sentencing hearing, during which the Court clarified its sentencing decision. Specifically, the Circuit Court explained that it found Lewis' conduct to be outrageously or wantonly vile, in that her acts reflected a depravity of mind. Additionally, the Circuit Court found that Shallenberger and Fuller had committed aggravated batteries upon the murder victims, and the Court imputed those aggravated batteries to the defendant.

---

[2] The court will hereinafter refer to the joint appendix filed by Lewis' trial counsel and the Commonwealth on Lewis' direct appeal as "Direct Appeal J.A."

10

Lewis' sentences of death were unanimously affirmed on direct appeal on March 5, 2004,[3] see Lewis I, 593 S.E.2d at 229, and on April 30, 2004, the Supreme Court of Virginia denied her petition for rehearing. Lewis then filed a petition for writ of certiorari in the United States Supreme Court. After the petition for writ of certiorari was denied, Lewis initiated post-conviction proceedings in the Supreme Court of Virginia. On December 3, 2004, Lewis filed a 112-page, 27-claim petition for writ of habeas corpus, along with a motion for leave to exceed the page limitation set forth in Rule 5:7A(g) of the Rules of the Supreme Court of Virginia. On December 17, 2004, the Supreme Court of Virginia denied the motion and ordered her to refile her petition in a format that did not exceed 50 pages.

On December 27, 2004, Lewis filed a 50-page habeas petition in accordance with the Supreme Court's previous order, in which she raised sixteen claims of error. On August 15, 2005, the Supreme Court referred Lewis' petition to the Circuit Court for an evidentiary hearing on the following claims, pursuant to Virginia Code § 8.01-654(C):[4]

I. Teresa was denied effective assistance of counsel . . . by trial counsel's failure to adequately investigate and present affirmative or rebuttal evidence on the "depravity of mind" aggravator.

II. Teresa was denied effective assistance of counsel . . . by trial counsel's failure to adequately investigate and present mitigating evidence.

III. Teresa was denied effective assistance of counsel . . . by counsel's failure to adequately advise her of the mitigating

---

[3] The Supreme Court of Virginia found that "the evidence of record [was] overwhelming that the defendant's conduct showed a depravity of mind." Lewis I, 593 S.E.2d at 227. In light of this finding, the Supreme Court declined to decide whether the Circuit Court erred in imputing the aggravated batteries committed by Fuller and Shallenberger to the defendant. Id.

[4] The remaining claims were taken under advisement.

and state-of-mind evidence that could be presented on her
behalf and thus failed to adequately advise her on the
decision to plead guilty and to waive her right to a jury trial.

VII.    Teresa was denied effective assistance of counsel . . . by
trial counsel's failure to adequately investigate and present
evidence of Teresa's mental retardation, and their failure to
demand a determination on non-mental retardation.

(50-Page Pet. at i-ii). The Circuit Court subsequently conducted a four-day evidentiary hearing,

and on April 10, 2006, the Court submitted a report to the Supreme Court of Virginia, in which it

recommended that all four claims be denied.[5]

After further briefing and oral argument, the Supreme Court of Virginia denied <u>habeas</u>

relief in two opinions issued on June 8, 2007. In a published opinion, the Court addressed the

four claims that had been the subject of the evidentiary hearing. <u>Lewis v. Warden</u> (<u>Lewis II</u>), 645

S.E.2d 492 (Va. 2007). The Court addressed the remaining claims in an unpublished opinion.

<u>Lewis v. Warden</u> (<u>Lewis III</u>), 2007 Va. LEXIS 68 (Va. June 8, 2007). On September 25, 2007,

the Court denied Lewis' petition for rehearing.

Lewis commenced the present action by filing a petition for writ of habeas corpus under

28 U.S.C. § 2254. The petition asserts the following fifteen claims:

I.    Teresa was denied effective assistance of counsel in
violation of the U.S. Constitution's 6th, 8th and 14th
Amendments by trial counsel's failure to adequately
investigate and present affirmative or rebuttal evidence on
the "depravity of mind" aggravator.

II.    Teresa was denied effective assistance of counsel in
violation of the U.S. Constitution's 6th, 8th and 14th
Amendments by trial counsel's failure to adequately
investigate and present mitigation evidence.

---

[5] The Honorable Charles J. Strauss conducted the evidentiary hearing and submitted the required
report to the Supreme Court. Judge Strauss also presided over Lewis' criminal case.

III.     Teresa was denied her rights under the U.S. Constitution's 6th, 8th and 14th Amendments because the Virginia statute requires a judge, instead of a jury, to determine the existence of the aggravator.

IV.     Teresa was denied effective assistance of counsel under the U.S. Constitution's 6th, 8th and 14th Amendments by trial counsel's failure to adequately preserve Teresa's "Apprendi/Ring rights" regarding a jury determination of the aggravator.

V.     Teresa's guilty plea must be vacated under the U.S. Constitution's 5th, 6th, 8th and 14th Amendments because it was not knowing and voluntary as she was never advised of her "Apprendi/Ring" rights.

VI.     Teresa was denied effective assistance of counsel under the U.S. Constitution's 6th, 8th and 14th Amendments by trial counsel's failure to adequately advise her of her "Apprendi/Ring rights" regarding a jury determination of the aggravator.

VII.     Teresa was denied her due process and liberty rights under the 5th, 8th and 14th Amendments to the United States Constitution by the failure of the Supreme Court of Virginia to conduct a meaningful proportionality review.

VIII.     Teresa was denied her rights under the 5th, 8th and 14th Amendments to the U.S. Constitution by the application of the vileness aggravator to her.

IX.     Teresa was denied her rights under the U.S. Constitution's 5th, 6th, 8th and 14th Amendments because the grand jury failed to specify the aggravators that must be found to permit a death sentence.

X.     Teresa was denied effective assistance of counsel under the U.S. Constitution's 6th, 8th, and 14th Amendments by trial counsel's failure to adequately preserve Teresa's indictment-related Ring rights.

XI.     As Teresa is innocent of capital murder, her conviction and death sentence violate her rights under the 5th, 6th, 8th and 14th Amendments to the United States Constitution.

13

XII.     Teresa was denied effective assistance of counsel under
         the U.S. Constitution's 6th, 8th and 14th Amendments by
         trial counsel's failure to adequately investigate or
         challenge the Commonwealth's "murder for hire" elevator.

XIII.    The trial court did not conduct a separate evaluation that
         death was appropriate, in violation of Teresa's rights under
         the 6th, 8th, and 14th Amendments to the U.S.
         Constitution.

XIV.     Teresa was denied effective assistance of counsel under
         the U.S. Constitution's 6th, 8th and 14th Amendments by
         trial counsel's failure to adequately advise her of the
         mitigating and state-of-mind evidence that could be
         presented on her behalf and thus failed to adequately
         advise her on the decision to plead guilty and to waive her
         right to a jury trial.

XV.      Teresa was denied effective assistance of counsel under
         the U.S. Constitution's 6th, 8th, and 14th Amendments by
         the combination of trial counsel's failures as set forth in
         Claims I, II, IV, VI, X, XII, and XIV.

(Fed. Habeas Pet. at i-v). On March 6, 2008, the respondent moved to dismiss Lewis' petition.

The court held a hearing on the motion to dismiss on September 18, 2008. Following the

hearing, the parties were given the opportunity to submit supplemental memoranda pertaining to

Lewis' claims under Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536

U.S. 584 (2002). All of Lewis' claims are now fully briefed and ripe for review.

## Standards of Review

Under 28 U.S.C. § 2254(b), a federal petitioner challenging a state court conviction or

sentence must generally exhaust remedies available in the courts of the state in which she was

convicted before seeking federal habeas review. 28 U.S.C. § 2254(b)(1). When a claim has been

adjudicated on the merits in state court, a federal court owes considerable deference to the state

court's decision with respect to that claim. Section 2254(d) provides as follows:

14

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" the Supreme Court's clearly established precedent if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a different result." Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" of Supreme Court precedent occurs when a state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] petitioner's case." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (internal quotations omitted). Thus, when reviewing a state decision under § 2254(d), the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher standard." Schriro v. Landrigan, 550 U.S. 465, 127 S. Ct. 1933, 1939 (2007) (citing Williams, 529 U.S. at 410); see also Yarborough v. Johnson, 520 F.3d 329, 336 (4th Cir. 2008).

15

A petitioner alleging that a state court based its decision on an "unreasonable determination of the facts" under § 2254(d)(2) must also satisfy a demanding standard. As the United States Supreme Court emphasized in Schriro, supra, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." Schriro, 127 S. Ct. at 1939. In addition, § 2254(e)(1) provides that a state court's factual determinations "shall be presumed to be correct" and that the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1).

## Discussion

I.    **Claims that counsel was ineffective in failing to investigate and present available rebuttal and/or mitigation evidence at sentencing (Claims I and II)**

In her first two claims, Lewis alleges that she received ineffective assistance of counsel during the sentencing phase of the criminal proceedings. Specifically, Lewis claims that her counsel rendered constitutionally ineffective assistance by failing to investigate, develop, and present at sentencing evidence of her borderline intellectual function, dependent personality disorder, and prescription drug addiction. Lewis argues, in claim I, that such evidence should have been presented to rebut the Commonwealth's case on the aggravating factor of depravity of mind, and she argues, in claim II, that the evidence should have been presented to mitigate against the imposition of the death penalty.

Claims that counsel provided ineffective assistance are governed by the two-prong test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance, Lewis must first establish that counsel's

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 16 of 53   Pageid#: 329

performance was "deficient." Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. The standard for deficient performance is an objective one, focusing on "whether counsel's representation fell below an objective standard of reasonableness." Id. at 688. Second, Lewis must show that counsel's deficient performance prejudiced her defense. Id. To demonstrate prejudice, Lewis generally "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. When a petitioner challenges a death sentence, the prejudice inquiry focuses on "whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

Lewis previously raised claims I and II in her state habeas petition. The Supreme Court of Virginia referred the claims to the Circuit Court for an evidentiary hearing, during which the Circuit Court had the opportunity to consider the additional evidence that allegedly could have been presented at sentencing, but for counsel's failure to investigate. As previously noted, the evidentiary hearing was conducted by the Honorable Charles J. Strauss, the same judge who sentenced Lewis to death for her two capital murder convictions.

At the evidentiary hearing, Lewis' habeas counsel first elicited testimony from Deborah T. Grey, a licensed clinical social worker retained by habeas counsel to perform a "mitigation investigation." (Habeas Joint Appendix at 17).[6] Grey reported that Lewis grew up in a low income family, that she attended six different schools before she reached the seventh grade, and

---

[6] The court will hereinafter refer to the joint appendix filed by Lewis' habeas counsel and the Commonwealth as part of the state habeas corpus proceedings as "Habeas J.A."

17

that she did not advance beyond the tenth grade. Grey also testified that Lewis held 49 different jobs during a 14-year period, and that Lewis' employment records indicated that she had difficulty maintaining consistent attendance. Additionally, Grey testified that numerous people told her that Lewis had "difficulty planning beyond the next day" and that Lewis "craved attention." (Habeas J.A. at 106, 116).

Grey also investigated Lewis' medical history and her use of prescription drugs. Grey testified that Lewis had a long history of medical problems; that she had undergone various surgical procedures, including an appendectomy, a hysterectomy, and ovarian cystectomies; and that she had been diagnosed with anxiety and depression. Based on her review of Lewis' prescription drug use, Grey, a certified substance abuse counselor, opined that Lewis was addicted to prescription medications. Grey noted that, by the fall of 2002, five of Lewis' physicians had refused to prescribe further narcotics.

Lewis' sister, Cynthia W. Sams, and her father, Melvin C. Wilson, both testified regarding Lewis' prescription drug use. Sams reported that Lewis took pain medication prescribed for other people, including Julian, a friend, and family members, and that when Lewis took too much pain medication, she would "talk[] out of her mind" and not "be[] herself." (Habeas J.A. at 179). According to Sams, Lewis' behavior was affected by her use of pain medication in the fall of 2002, when Julian and C.J. were murdered. Likewise, Lewis' father testified that he saw Lewis the Monday before the murders, and that she acted as if she had taken too many pills.

Jonathan Presley, one of Lewis' former boyfriends, testified that Lewis liked attention, that "[s]he had common sense but not a lot of book knowledge," that she was not organized, and

that the couple "lived in the moment" when they were together. (Habeas J.A. at 131, 133). Presley also testified that Lewis was "good to her friends," that she was never violent or aggressive, and that she helped care for her mother after her mother suffered a stroke. (Habeas J.A. at 135). Lewis' father also confirmed that Lewis helped him care for her mother for a period of time prior to her mother's death.

Several other witnesses testified regarding Lewis' need for attention. For instance, Lewis' sister testified that Lewis "didn't want to be alone," and that "[s]he let men take advantage of her." (Habeas J.A. at 176). Likewise, Debbie Anderson, the mother of one of Lewis' former boyfriends, testified that Lewis was an "extremely insecure" person, who craved attention and "needed approval for everything." (Habeas J.A. at 149).

Philip R. Costanzo, Ph.D., a psychologist retained by Lewis' habeas counsel, testified that he "could not rule out mental retardation," based on Lewis' academic performance, her work history, and her inability to retain relationships with men. (Habeas J.A. at 265). Although Dr. Costanzo testified that Lewis had a "mental age" of twelve to fourteen, he acknowledged that members of his profession had discredited this type of assessment for years and that it is "not a standard practice." (Habeas J.A. at 281-282). Dr. Costanzo also opined that Lewis did not have the mental capacity to "autonomously decide a plan and carry out and lead others to engage in actions related to [the murders]," and that she met the criteria for dependent personality disorder. (Habeas J.A. at 270).

Dr. Louis Eliacin, a gynecologist, testified that he treated Lewis for twelve to fifteen years. During that time, he performed several surgeries on Lewis and prescribed pain medication for problems related to ovarian cysts. Dr. Eliacin testified that, at some point during his

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 19 of 53   Pageid#: 332

treatment of Lewis, he determined that she was addicted to pain medication, and that his medical records showed that, on October 1, 2002, his office manager noted that he would no longer prescribe pain medication for Lewis.

Lewis' habeas counsel also called Dr. Barbara Haskins as a witness. Dr. Haskins, who was previously retained as a mental health expert by Lewis' trial counsel, testified that she advised Lewis' trial counsel that Lewis demonstrated traits of a dependent personality but that she lacked adequate information to confidently state that Lewis satisfied the criteria for dependent personality disorder. Upon reviewing the information contained in Deborah Grey's mitigation report, Dr. Haskins testified that Lewis "met enough of the criteria for dependent personality to meet the diagnostic standard." (Habeas J.A. at 458).

Lewis' habeas counsel also elicited testimony from Dr. Elinore McCance-Katz, an addiction psychiatrist. Based on her interview with Lewis and her review of various records, Dr. McCance-Katz opined that Lewis suffered from borderline intellectual function and prescription drug addiction at the time of the murders, and that she exhibited dependent personality traits. Based on these "disabilities," Dr. McCance-Katz opined that it was highly unlikely that Lewis was capable of being a leader or mastermind of the crimes. (Habeas J.A. at 565).

With respect to Lewis' prescription drug use, Dr. McCance-Katz testified that the amount of narcotic medications that Lewis was taking at the time of the crimes would have impaired her cognition and impacted her affect in such a manner that she appeared "uncaring." (Habeas J.A. at 566). Dr. McCance-Katz also testified that Lewis appeared to be suffering from opiate withdrawal syndrome during the three months preceding the crimes, which can affect a person's thinking, reasoning, and judgment. However, on cross-examination, Dr. McCance-Katz

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 20 of 53   Pageid#: 333

acknowledged that Lewis engaged in "purposeful" or "goal directed" conduct on the night of the murders, and that none of the actions required to carry out the murder plan was beyond Lewis' abilities. (Habeas J.A. at 603, 611). Dr. McCance-Katz also acknowledged that Lewis is not mentally retarded. (Habeas J.A. at 593).

The Commonwealth introduced its own expert at the evidentiary hearing, Leigh D. Hagan, Psy.D., a forensic and clinical psychologist. Based on his personal evaluation of Lewis and his review of Lewis' records, Dr. Hagan testified that Lewis does not satisfy the criteria for mental retardation set forth in Virginia Code § 19.2-264.3:1.1. To support his opinion, Dr. Hagan first provided examples of Lewis' "adaptive functioning" abilities. (Habeas J.A. at 723). For instance, Dr. Hagan noted that Lewis did not fail any grade levels in school and that she was not terminated from any of her jobs for not understanding her employment duties. Dr. Hagan also emphasized that Lewis had the conceptual capacity to take care of her parents' needs, and that she earned passing grades in a certified nursing assistant program while also working as a clerk at a convenience store. Additionally, Dr. Hagan noted that Lewis had a drivers' license and that she had been a prolific writer while incarcerated, sending letters to trial counsel and multiple pen pals. Based on these observations, Dr. Hagan opined that Lewis is, and had been, functioning "well above" the threshold for adaptive functioning contemplated by Virginia Code § 19.2-264.3:1.1. (Habeas J.A. at 733).

To assess Lewis' intellectual functioning, Dr. Hagan administered the same intelligence test that Dr. Haskins had employed to assess Lewis' competency to stand trial. Dr. Hagan reported that Lewis earned a verbal I.Q. test score of 72, a performance I.Q. test score of 74, and a full scale I.Q. test score of 70. However, based on "other cognitive benchmarks in Ms. Lewis'

21

life going back to her school records," Dr. Hagan testified that the I.Q. test scores represented an underestimate of Lewis' intellect, and that Lewis likely put forth submaximal effort on the test. (Habeas J.A. at 736-737). Dr. Hagan ultimately opined that Lewis does not satisfy the intellectual functioning prong of the statutory test for mental retardation.

Dr. Hagan also opined that Lewis does not meet the prevailing diagnostic criteria for dependent personality disorder. Dr. Hagan acknowledged that Lewis demonstrated passive-aggressiveness or an aggressive dependency in the manner in which she handled herself in relationships. However, according to Dr. Hagan, this "personality style" or "personality propensity" does not rise to the level of a disorder. (Habeas J.A. at 746-747).

As for Lewis' prescription drug use, Dr. Hagan testified that the evidence in the record is insufficient to support the conclusion that Lewis suffered from an addictive disorder. In his report, Dr. Hagan stated that, to the extent Lewis abused prescription medications, "her intoxication was voluntary" and it "did not cause an extreme mental or emotional disturbance." (Habeas J.A. at 1467). Dr. Hagan further emphasized that Lewis "maintained an appreciation of the nature, character and consequence of her acts." (Habeas J.A. at 1468).

In addition to Dr. Hagan, the Commonwealth elicited testimony from Teresa R. Turner, the head nurse at the Danville City Jail, where Lewis was initially incarcerated in November and December of 2002. Turner testified that Lewis was examined by a mental health counselor on November 27, 2002, and that Lewis did not voice any medical complaints of drug withdrawal or other symptoms prior to that date.

In addressing Lewis' claim "that trial counsel provided ineffective assistance because they failed to present available mitigation evidence during the penalty phase of her trial," and her

22

claim "that counsel should have presented evidence to rebut the Commonwealth's theory that Lewis [acted with a depraved mind]," the Supreme Court of Virginia proceeded directly to the prejudice inquiry under Strickland. Lewis II, 645 S.E.2d at 504. The Court ultimately concluded that Lewis failed to demonstrate that she was prejudiced by trial counsel's failure to investigate and present the evidence introduced at the habeas hearing. Id. The Court held that "the record does not demonstrate that, but for trial counsel's alleged failures, there is a reasonable probability that the result of the proceedings would have been different." Id.

In the instant petition, Lewis initially challenges the manner in which the Supreme Court of Virginia evaluated claims I and II. Since the Court performed a combined analysis of the merits of the two claims, and, at times, referred to the additional evidence on which the claims are based as "mitigation evidence," Lewis contends that the Supreme Court failed to address claim I altogether and only considered claim II. This contention, however, is without merit. It is clear from the published habeas opinion that the Supreme Court considered the merits of both claims. Moreover, the manner in which the Supreme Court evaluated the claims was entirely reasonable given the thrust of these claims. Both claims fault trial counsel for not investigating evidence pertaining to Lewis' mental capacity, her alleged dependant personality disorder, and her alleged prescription drug addiction. Likewise, both claims fault trial counsel for not presenting such evidence during the sentencing phase of the criminal proceedings, either to weaken the Commonwealth's case in aggravation (claim I) or to strengthen Lewis' case in mitigation (claim II). In addition, both claims are governed by the same standard of prejudice under Strickland – whether "a reasonable probability exists that, but for the deficient performance, [Lewis] would not have been sentenced to death." Buckner v. Polk, 453 F.3d 195,

201 (4th Cir. 2006). Based on the foregoing, the Supreme Court of Virginia justifiably combined its analysis of the merits of claims I and II, and its decision with respect to these claims is subject to § 2254(d)'s deferential standard of review.[7]

Under § 2254(d)(1), the narrow question presented on federal habeas review is whether the Supreme Court of Virginia reached a decision contrary to, or unreasonably applied, Strickland and its progeny in finding that Lewis failed to demonstrate the requisite prejudice. See 28 U.S.C. § 2254(d)(1). It is not enough for Lewis to show that counsel's allegedly deficient performance had "some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Instead, Lewis "must show that there is a reasonable probability that, but for counsel's unprofessional errors, [her sentences] would have been different. Id. at 694. In making this determination, as the Supreme Court of Virginia properly observed, the court must "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" Lewis II, 645 S.E.2d at 504 (quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)).

Having reviewed the record, the court concludes that Lewis has failed to meet her substantial burden of showing that the Supreme Court of Virginia was unreasonable in finding a lack of prejudice. As the Supreme Court emphasized in its published habeas opinion, the aggravating evidence in Lewis' case was compelling. Lewis II, 645 S.E.2d at 504-505. Lewis intended to profit from the murders of Julian and C.J. by receiving the proceeds from C.J.'s life

---

[7] The court further notes that it is unpersuaded by Lewis' assertion that evidence presented to rebut the Commonwealth's evidence in aggravation is not appropriately characterized as mitigation evidence. Indeed, "any evidence that may provide a basis for a sentence less than death is [generally] considered mitigating." King v. Netherland, 1997 U.S. Dist. LEXIS 11678, at *67 (W.D. Va. Aug. 4, 1997) (rejecting petitioner's attempt to characterize a mental health expert's testimony as non-mitigating, since it was "presented to rebut the Commonwealth's evidence of future dangerousness rather than as evidence in mitigation").

24

insurance policy and additional assets held by Julian. She informed the killers about the money that she would inherit from her two relatives and led them to believe that they would share in the funds once the murders were committed. Lewis paid the killers $1,200 to purchase weapons and assisted their entry into the home on the night of the murders, by leaving one of the doors unlocked and making sure that the couple's pit bull was locked in an extra bedroom.

During the hours before the murders, Lewis engaged in diversionary conduct with Julian. She encouraged Julian to pray with her before he went to bed, and she had her daughter talk with him on the phone to make him believe that all was normal. Additionally, to deflect any later suspicion by the police, Lewis intentionally left a lunch bag for Julian in the refrigerator that contained a love note.

After the shootings, Lewis retrieved Julian's pants and wallet from the couple's bedroom, where Julian had been shot, and proceeded to remove money from the wallet to give to Shallenberger. Once Fuller and Shallenberger left the house, Lewis waited approximately 45 minutes, while Julian was still alive and suffering from multiple gunshot wounds, before calling 911. In the meantime, she spoke to two of her friends on the telephone and concocted a false story about unknown intruders. While the deputies were trying to assist the victims, one of whom was still alive, Lewis had another telephone conversation with a friend, during which she discussed C.J.'s purported failure to lock the back door, within earshot of the deputies.

On the day of the murders, and then a second time a few days later, Lewis spoke to C.J.'s commanding officer and asked him when she would receive her inheritance. Lewis also called Julian's employer on the day of the murders and asked him when she would receive Julian's

25

paycheck. Five days later, Lewis forged a check at the bank in an attempt to withdraw $50,000 from Julian's bank account.

On the other side of the balance, the evidence that Lewis produced during the state habeas hearing was refuted by the Commonwealth's own evidence. Although Lewis' habeas experts opined that it was highly unlikely that Lewis had the cognitive ability to plan the murders, the Commonwealth's expert, Dr. Hagan, testified that Lewis had the mental capacity to plan the murders with Shallenberger and to help execute the plan that the two of them devised. Likewise, while Lewis' experts concluded that Lewis suffered from a dependent personality disorder, which would have affected her ability to make decisions or initiate activities on her own, Dr. Hagan testified that Lewis did not suffer from a personality disorder, but instead exhibited conduct suggestive of a passive-aggressive or aggressive-dependent personality. As for Lewis' prescription drug use, Lewis' habeas experts opined that Lewis was addicted to prescription drugs. On the other hand, Dr. Hagan testified that there was not sufficient evidence in the record to support the finding that Lewis had an addictive disorder, and the nurse from the Danville City Jail testified that Lewis did not complain of any medical problems associated with drug withdrawal during the time period in which she was initially incarcerated following the murders. In any event, evidence that a defendant has abused drugs is, as the Supreme Court of Virginia indicated, "double-edged," since "a jury could well find [it] to be aggravating rather than mitigating." Johnson v. Moore, 1998 U.S. App. LEXIS 23907, at *41 (4th Cir. Sept. 24, 1998).

Weighing the aggravating circumstances surrounding the murders against the totality of the available mitigating evidence, the court concludes that the Supreme Court's decision that Lewis failed to demonstrate prejudice was not an unreasonable application of federal law. In

26

arguing to the contrary, Lewis contends that the evidence she presented at the evidentiary hearing "measures up to" the evidence presented in a trio of recent cases in which prejudice has been found. (Fed. Habeas Pet. at 59) (citing Williams v. Taylor, 529 U.S. 362 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); and Rompilla v. Beard, 545 U.S. 374 (2005)). This, however, is not the appropriate inquiry.[8] As the United States Court of Appeals for the Fourth Circuit recognized in Yarborough, supra:

> The question a reviewing court must answer in determining whether a petitioner was prejudiced by a failure to present [mitigation] evidence . . . is not whether the evidence was as "powerful" as the evidence in other cases, but rather whether the evidence was "powerful" enough to offset the aggravating evidence and demonstrate a reasonable probability of a different result in the petitioner's case.

Yarborough, 520 F.3d at 342 (emphasis in original). Here, the Supreme Court of Virginia engaged in the appropriate inquiry and reasonably concluded that Lewis failed to establish the requisite prejudice. As the Supreme Court emphasized in reaching its decision:

---

[8] Even if this was the appropriate inquiry, a review of the available mitigation evidence in Williams, Wiggins, and Rompilla presents stark contrasts with the evidence presented in this case. See Williams, 529 U.S. at 395-397 (finding prejudice from counsel's failure to present evidence of Williams' borderline mental retardation and "nightmarish childhood," which included evidence that petitioner's parents had been imprisoned for the criminal neglect of petitioner and his siblings, as well as evidence that petitioner had been severely and repeatedly beaten by his father); Wiggins, 539 U.S. at 534-537 (finding prejudice from counsel's failure to alert the jury to the petitioner's "excruciating life history," which included neglect by his alcoholic mother, who would abandon petitioner and his siblings for days, during which they were forced to beg for food and eat paint chips; beatings for breaking into the family's locked kitchen; petitioner's hospitalization after his mother forced his hand against a hot stove burner; physical abuse by two different foster mothers; repeated sexual abuse by a foster father; and gang rapes by a third foster mother's sons); Rompilla, 545 U.S. at 390-393 (finding prejudice where further investigation would have revealed evidence suggestive of schizophrenia, organic brain damage, and mental retardation, as well as evidence that the petitioner and his mother were severely beaten by the petitioner's father; that the petitioner had an agonizing childhood, during which he was locked in a mesh dog pen filled with excrement, isolated from other children, and slept in an attic with no heat; that the petitioners' parents were both severe alcoholics; and that the petitioner's mother drank while she was pregnant with him, resulting in fetal alcohol syndrome).

27

The several witnesses who testified concerning the available mitigation evidence thus described various problems Lewis faced as a result of her personality deficits, drug dependence, and level of intellectual functioning. This testimony, however, did not satisfy Lewis' burden of proof in the present proceedings. The evidence in aggravation of the offenses, when weighed against the totality of the available mitigation evidence, showed that notwithstanding the various difficulties Lewis experienced over the course of her life, she killed her two relatives solely for monetary gain in a deliberately planned and executed scheme. Any psychological, cognitive, and physical difficulties Lewis may have had could not explain or even mitigate the carefully calculated conduct that Lewis exhibited in carrying out these crimes.

Lewis II, 645 S.E.2d 492.

The court's decision to extend deference to the Supreme Court's determination that Lewis failed to demonstrate prejudice is reinforced by the fact that the same judge who presided over Lewis' sentencing hearing, and ultimately sentenced her to death, also presided over the state habeas hearing. That judge specifically found that none of the evidence presented in support of claims I and II would have caused him to reconsider his decision to impose the death penalty. This finding, based on the judge's familiarity with the record, the evidence presented at sentencing, and the evidence presented by Lewis' habeas counsel, provides an additional reason to defer to the Supreme Court's decision on the merits of claims I and II. See Williams, 529 U.S. at 396-397 (emphasizing, in support of its finding of prejudice, that "the very judge who presided at Williams' trial and who once determined that the death penalty was 'just' and 'appropriate,' concluded, after hearing the additional evidence developed in the post conviction proceedings, that there existed 'a reasonable probability that the result of the sentencing phase would have been different' if the jury had heard that evidence").

28

In addition to rejecting the proposition that the Supreme Court of Virginia's decision "involved an unreasonable application of" federal law, the court also cannot say that the Supreme Court's decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). While Lewis takes issue with several aspects of the Supreme Court's characterization of the facts, particularly those related to the testimony of Dr. McCance-Katz, the Court's findings appear to be "substantially correct, or if not correct, at least a reasonable summation of the testimony presented at the evidentiary hearing." Yarborough, 520 F.3d at 343 (citing § 2254(d)(2)). Accordingly, for the foregoing reasons, claims I and II must be dismissed.

## II.  Claims under Apprendi and Ring (Claims III, IV, V, VI, IX, and X)

Lewis' next group of claims is premised on the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002). In Apprendi, the petitioner pled guilty to two counts of second degree possession of a firearm for an unlawful purpose. Apprendi, 530 U.S. at 469. Although second degree offenses carried a penalty range of five to ten years under New Jersey law, the trial judge sentenced the petitioner to a term of imprisonment of twelve years for one of the second degree charges, pursuant to a state hate crime statute. Id. at 468, 471. That statute permitted a trial judge to impose an extended sentence of ten to twenty years, if the judge found, by a preponderance of the evidence, that the defendant acted with the purpose to intimidate a group or individual on the basis of race, color, gender, handicap, religion, sexual orientation or ethnicity. Id. at 468. On certiorari, the United States Supreme Court invalidated the challenged sentencing scheme, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty of a crime beyond the prescribed

29

statutory maximum, must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.[9]

Two years later, the United States Supreme Court extended Apprendi to the death penalty context in Ring v. Arizona, supra. Applying Apprendi, the Ring Court invalidated Arizona's capital sentencing scheme, which, at the time, required a trial judge, sitting alone, to determine the presence or absence of aggravating factors required for imposition of the death penalty, following a jury adjudication of a defendant's guilt. Ring, 536 U.S. at 588. The Court observed that it had previously held that Arizona's capital sentencing scheme complied with the Sixth Amendment, since "the additional facts found by the judge qualified as sentencing considerations, not as 'elements of the offense of capital murder.'" Id. (quoting Walton v. Arizona, 497 U.S. 639, 649 (1990). However, because the Court found Walton's holding in this regard to be irreconcilable with Apprendi, the Court overruled Walton, in pertinent part, and emphasized that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id.

### A.    Claims III and IV

Under Virginia law, when a defendant pleads guilty to an offense that is punishable by death, the trial court conducts the capital sentencing proceeding. See Va. Code § 19.2-257

---

[9] As will be discussed, infra, however, the Apprendi Court specifically emphasized that its decision did not affect state capital sentencing statutes requiring judges to find aggravating factors before imposing a death sentence. Apprendi, 530 U.S. at 496-497. The Court noted that "'once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . .'" Id. (quoting Almendarez-Torres v. United States, 523 U.S. 224, 257, n.2 (1998)).

30

("Upon a plea of guilty in a felony case . . . the court shall hear and determine the case without intervention of a jury."). Relying on Apprendi and Ring, Lewis argues, in Claim III, that the Virginia capital sentencing scheme is unconstitutional, because it does not provide a defendant who pleads guilty to a capital offense the opportunity to have a jury consider the aggravating factors that make a defendant eligible for the death penalty. Stated differently, Lewis contends that a jury determination of the aggravating factors is constitutionally required, even if the defendant waives a jury determination of the elements of capital murder by pleading guilty.

When Lewis raised the same claim in her state habeas petition, the Supreme Court of Virginia held that the claim was procedurally defaulted, since it could have been raised at trial and on direct appeal. Lewis III, 2007 Va. LEXIS 68, at *9 (citing Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974)). The Fourth Circuit has repeatedly recognized that the procedural rule set forth in Slayton v. Parrigan provides an adequate and independent ground for denying a claim for habeas relief. Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998). Consequently, this court may not review the merits of the claim "absent cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default." Id. To show cause, a petitioner must demonstrate that there was "some objective factor external to [her] defense," which impeded her from raising her claim at an earlier stage. Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must show that the alleged constitutional violation worked to her actual and substantial disadvantage, infecting her entire trial with error of a constitutional magnitude. Id.

In the instant petition, Lewis argues that trial counsel rendered ineffective assistance by failing to preserve claim III for review in state court, and that counsel's ineffective assistance provides cause to excuse her procedural default. See Edwards v. Carpenter, 529 U.S. 446, 451

31

(2000) (recognizing that, in certain circumstances, counsel's ineffectiveness in failing to preserve a claim for review in state court can constitute cause to excuse a procedural default). Thus, Lewis has presented, as cause for her procedural default of her claim challenging the constitutionality of Virginia's capital sentencing scheme (Count III), the ineffective assistance claim that is set forth separately in Count IV of her federal petition.

Lewis previously raised the ineffective assistance claim in state court, as required by United States Supreme Court precedent. See Id. at 451-452 (holding that a claim of ineffective assistance "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default'") (quoting Murray, 477 U.S. at 489). In rejecting the claim, the Supreme Court of Virginia held that Lewis failed to demonstrate the requisite prejudice. See Lewis III, 2007 Va. LEXIS 68, at *5-6.

Because the Supreme Court of Virginia addressed the claim on the merits, the respondent argues that this court must apply § 2254(d)'s deferential standard of review to both the independent ineffective assistance claim set forth in claim IV of the instant petition, as well as to Lewis' assertion that counsel's ineffective assistance provides cause to excuse her procedural default of the underlying constitutional claim (claim III). However, this issue – whether "the same claim of ineffective assistance of counsel get[s] reviewed differently when presented merely as cause for a procedural default as opposed to being presented [separately] in a petition as the basis in the first instance for habeas relief," Lee v. Davis, 328 F.3d 896, 901 (7th Cir. 2003) – is unresolved in the Fourth Circuit, and "the handful of courts to have considered the issue have reached differing results," Powell v. Kelly, 531 F. Supp. 2d 695, 723 (E.D. Va.

32

2008).[10] While some courts have held that the claim is reviewed <u>de novo</u>, <u>Joseph v. Coyle</u>, 469

F.3d 441, 459 (6th Cir. 2006); <u>Fishetti v. Johnson</u>, 384 F.3d 140, 154-155 (3d Cir. 2004); <u>Green</u>

<u>v. Johnson</u>, 2007 U.S. Dist. LEXIS 21711, at *3 (E.D. Va. Mar. 26, 2007) (Smith, J.), others

have concluded that § 2254(d)'s deferential standard applies, <u>Winston v. Kelly</u>, 2008 U.S. Dist.

LEXIS 42565, at *29-30 (W.D. Va. May 30, 2008) (Wilson, J.); <u>Yarborough v. Johnson</u>, 2006

U.S. Dist LEXIS 67540, at *7 (E.D. Va. Sept. 5, 2006) (Stillman, J.); <u>Orbe v. True</u>, 233 F. Supp.

2d 749, 758 (E.D. Va. 2002) (Ellis, J.).

   In the instant case, the court finds it unnecessary to resolve this issue. Even if the court

assumes that <u>de novo</u> review is appropriate for an ineffective assistance claim asserted as cause

for procedural default, the court concludes, for the following reasons, that Lewis has failed to

demonstrate that trial counsel's performance was constitutionally deficient. Consequently, claim

IV fails on the merits, and claim III is procedurally barred from review.

   As previously stated, Lewis argues that trial counsel rendered ineffective assistance by

failing to "timely challenge the Virginia statute requiring a judge to conduct the sentencing

proceeding following a guilty plea." (Fed. <u>Habeas</u> Pet. at 62). Relying on <u>Apprendi</u> and <u>Ring</u>,

both of which were decided before Lewis was sentenced, Lewis contends that a reasonable

capital defense attorney would have known that Lewis was entitled to a jury determination of the

---

[10] In <u>Orbe v. True</u>, 82 Fed. Appx. 802, 808 (4th Cir. 2003), the Fourth Circuit explicitly refrained
from ruling on this issue. Likewise, the Seventh Circuit has expressly refrained from deciding this
"preliminary puzzle." <u>Lee</u>, 328 F.3d at 901.

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 33 of 53   Pageid#: 346

aggravating factors, even if she pled guilty to the elements of capital murder.[11] (Pet.'s Supplemental Mem. at 4).

Having reviewed the record and relevant case law, the court concludes that Lewis has failed to satisfy the first prong of the Strickland test. Specifically, the court cannot say that counsel's failure to demand a jury determination of the aggravating factors fell below an objective standard of reasonableness. First, contrary to Lewis' assertions, neither Apprendi nor Ring unequivocally dictates that a defendant who pleads guilty to capital murder and, thus,

---

[11] The court notes that, in addition to Ring and Apprendi, Lewis initially relied upon the United States Supreme Court's decision in Blakely v. Washington, 524 U.S. 296 (2004), which involved the constitutionality of the State of Washington's determinate sentencing scheme. (Fed. Habeas Pet. at 64). In Blakely, the petitioner pled guilty to second-degree kidnapping, a felony punishable by a term of imprisonment of not more than ten years. Blakely, 542 U.S. at 298-299. Other provisions of Washington law, however, mandated a sentencing range of 49 to 53 months, unless a sentencing judge found "substantial and compelling reasons justifying an exceptional sentence." Id. at 299 (internal citation and quotation marks omitted). Although the facts admitted in Blakely's guilty plea, standing alone, supported a maximum sentence of 53 months, the sentencing judge ultimately imposed a sentence of 90 months, based upon the judge's finding that Blakely had acted with "deliberate cruelty." Id. at 300. The Supreme Court, applying the rule expressed in Apprendi, 530 U.S. at 490 (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"), concluded that the imposition of the sentencing enhancement, which was based solely on the judge's factual findings, violated Blakely's rights under the Sixth Amendment, because the facts supporting the finding of deliberate cruelty were neither admitted by Blakely pursuant to his guilty plea nor found by a jury. Id. at 303-304. In so doing, the Court clarified that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303 (emphasis in original); see also Lyons v. Weisner, 247 F. App'x 440, 444 (4th Cir. 2007) ("In Blakely, the Supreme Court clarified its holding in Apprendi . . . .").

During the hearing on the respondent's motion to dismiss in this case, the court indicated that any reliance on Blakely to support the instant ineffective assistance claim would be inappropriate, since Blakely was not decided until after Lewis' convictions were affirmed on direct appeal. See, e.g., Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995) (stating that "the case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law"). Consequently, in her supplemental memorandum on the issue, Lewis focuses solely on Ring and Apprendi, and argues that, in light of these two decisions, "no trial counsel acting in accordance with reasonable professional norms would not know that [Lewis] was entitled to a jury determination at sentencing, even if she pled guilty." (Pet.'s Supplemental Mem. at 4).

34

waives her right to a jury trial, is nonetheless entitled to be sentenced by a jury. In her supplemental brief on this issue, Lewis contends that because the defendant in <u>Apprendi</u> pled guilty, her trial counsel should have known that the rule announced in <u>Apprendi</u> provided a legal basis for demanding a jury determination of the aggravating factors. The <u>Apprendi</u> decision itself, however, refutes this argument. As previously noted, the Supreme Court, in explaining the basis and reach of <u>Apprendi</u>, specifically rejected the notion that <u>Apprendi</u> rendered state capital sentencing schemes unconstitutional:

> [T]his court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. For reasons we have explained, the capital cases are not controlling:
>
> > Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . .

<u>Apprendi</u>, 530 U.S. at 496-497 (internal citations and quotation marks omitted). Thus, if anything, <u>Apprendi</u> would have led a reasonable defense attorney to believe that capital defendants were <u>not</u> entitled to a jury determination of the aggravating factors, regardless of whether they pled guilty to capital murder or proceeded to a jury trial.

Lewis' reliance on <u>Ring</u>, which was decided approximately eleven months before Lewis was sentenced, is also unpersuasive. Since <u>Ring</u> overruled prior precedent and applied <u>Apprendi</u> to the death penalty context, Lewis argues that a reasonable capital defense attorney would have known that Lewis "was entitled to a jury determination [of the aggravating factors] at sentencing,

35

even if she pled guilty." (Pet.'s Supplemental Br. at 4) (emphasis added). This argument, however, overlooks a significant, distinguishing fact. The capital defendant in Ring did not plead guilty; instead, the defendant entered a plea of not guilty and proceeded to trial.[12] Consequently, a decision holding that a defendant who pleads guilty to a capital offense is nonetheless entitled to a jury determination of the aggravating factors would have been an extension of Ring, and the court declines to conclude that counsel was ineffective for failing to advance this novel argument.[13] See Engle v. Isaac, 456 U.S. 107, 133-34 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Honeycutt v. Mahoney, 698 F.2d 213, 217 (4th Cir. 1983) (noting that counsel was not ineffective for his failure to perceive an extension of precedent).

---

[12] While Lewis insists that this distinction is of no consequence, two state appellate courts had, at the time Lewis was sentenced, specifically held that Ring is not implicated when a defendant pleads guilty. See Colwell v. Nevada, 59 P.3d 463, 473-474 (Nev. 2002) (rejecting petitioner's argument that his sentencing by a three-judge panel was unconstitutional under Ring, and emphasizing that Ring was not applicable, since, "unlike Ring, [petitioner] pleaded guilty and waived his right to a jury trial"); People v. Altom, 788 N.E.2d 55, 61 (Ill. App. Ct. 2003) ("Ring is not helpful to defendant in the case at bar, because he pleaded guilty.").

[13] In passing, the court notes that, as of the date of this opinion, the United States Supreme Court has not yet addressed the precise issue of whether a defendant who pleads guilty to a capital murder offense is entitled to a jury determination of the aggravating factors necessary to impose the death penalty. While the Supreme Court of Colorado has recently answered this question in the affirmative, in light of the United States Supreme Court's decision in Blakely, supra, the Supreme Court of South Carolina has held, post-Blakely, that a defendant waives her right to jury fact-finding at sentencing by pleading guilty. Compare People v. Montour, 157 P.3d 489, 498 (Colo. 2007) (holding that a "guilty plea alone does not constitute a waiver of the right to jury fact-finding on death eligibility") with State v. Downs, 604 S.E.2d 377, 380 (S.C. 2004) and State v. Crisp, 608 S.E.2d 429, 433 (S.C. 2005) (upholding the South Carolina statute that requires the sentencing proceeding to be held before a judge when a defendant pleads guilty to capital murder). In any event, as previously noted, Blakely was not decided until after Lewis' death sentences were affirmed on direct appeal and, thus, any reliance on Blakely to support Lewis' ineffective assistance claim would be inappropriate.

In any event, even if Lewis' trial counsel had conceived of the argument advanced by habeas counsel, demanding to be sentenced by a jury would have been entirely inconsistent with trial counsel's sentencing strategy. Indeed, it is abundantly clear from the record that trial counsel wanted Lewis to be sentenced by the trial judge, rather than a jury, because counsel believed that the judge was more likely to sentence her to life. In a comprehensive letter written to Lewis on May 14, 2003, the day before she pled guilty, trial counsel advanced several sound reasons for advising her "to plead guilty and [to] take [her] chances with the judge," including the likely prejudicial effect that the manner in which the victims were shot would have had on a jury, the likelihood that the judge would not impose a more severe sentence than that which the Commonwealth had agreed to recommend for Fuller, the fact that there were only two cases in Virginia in which the "hirer" in a murder-for-hire case had been sentenced to death, and the fact that Lewis had no history of violent crimes.[14] (Habeas J.A. at 1178).

While the sentences ultimately imposed by the trial judge were not what Lewis' counsel expected, counsel's advice to Lewis was clearly reasonable under the circumstances of this case, and the court declines to second-guess their strategic decision. See Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the

---

[14] Along the same lines, one of Lewis' defense attorneys, Thomas M. Blaylock, testified at the state habeas hearing that it became apparent to him, as the case developed, that Lewis "had a better chance with Judge Strauss than she did with a jury." (Habeas J.A. at 969). Blaylock stated that trial counsel spoke with a number of lawyers who practiced in Pittsylvania County Circuit Court, and that "the lawyers believed that the Judge would not impose [the] death penalty." (Habeas J.A. at 967). Blaylock also identified evidence that he believed would "inflame a jury," and emphasized that "juries in Pittsylvania County . . . are known to be pretty tough." (Habeas J.A. at 969).

37

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); see also Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir. 2003) (emphasizing that "review of counsel's strategic decisions . . . is 'highly deferential,' and [that] there is a presumption that 'counsel's conduct falls within the wide range of professional assistance'") (quoting Strickland, 466 U.S. at 689).

In sum, given the deference afforded under Strickland, the court concludes that trial counsel did not act unreasonably in failing to demand a jury determination of the aggravating factors or in failing to challenge the constitutionality of the Virginia capital sentencing scheme.[15] Accordingly, Lewis' claim of ineffective assistance (claim IV) is without merit and her substantive challenge to the constitutionality of the Virginia capital sentencing scheme (claim III) is procedurally barred from review.[16]

## B.    Claim V

In her fifth claim, Lewis challenges the validity of her guilty plea under Apprendi and Ring. Specifically, Lewis contends that her guilty plea was not knowing and voluntary, because

---

[15] In her petition, Lewis argues that an evidentiary hearing is required with respect to this ineffective assistance claim, because it was not the subject of an evidentiary hearing in state court. This argument is without merit. Even if a federal habeas petitioner did not receive the opportunity to develop an evidentiary basis for her claims in state court, a federal habeas court "is permitted to hold [an evidentiary] hearing only if the petitioner alleges additional facts that, if true, would entitle [her] to relief." Fullwood v. Lee, 290 F.3d 663, 681 (4th Cir. 2002) (internal citation and quotation marks omitted); see also Schriro, 127 S. Ct. at 1940 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). As the foregoing discussion indicates, Lewis has not met her burden of alleging facts that, if true, would warrant federal habeas relief. Accordingly, Lewis' request for an evidentiary hearing is denied.

[16] The court expresses no opinion as to whether the Virginia capital sentencing scheme passes constitutional scrutiny under Apprendi, Ring, and Blakely.

38

the Circuit Court failed to advise her of her alleged right to a jury determination of the aggravating factors required to impose the death penalty.

Lewis previously raised claim V in her state <u>habeas</u> petition. The Supreme Court of Virginia held that this claim was also procedurally defaulted, since it could have been raised on direct appeal. <u>Lewis II</u>, 2007 Va. LEXIS 68, at *10 (citing <u>Slayton</u>, <u>supra</u>). For the reasons alleged in claim IV, Lewis contends that her counsel was ineffective in failing to preserve the claim for review, and that counsel's ineffective assistance provides cause to excuse her default. However, having concluded that Lewis has failed to demonstrate that her counsel was constitutionally ineffective for purposes of claim IV, it follows that claim V must also be dismissed.

### C.     Claim VI

In Claim VI, Lewis contends that trial counsel was ineffective in failing to adequately advise her of her rights under <u>Apprendi</u> and <u>Ring</u>. To support this claim, Lewis emphasizes that she was never advised that she could plead guilty to capital murder, but nonetheless have a jury consider the aggravating factors necessary to impose a sentence of death. Lewis further argues that there is a reasonable probability that she would have requested a jury determination of the aggravating factors, had she been properly advised, and that she would have proceeded to a jury trial if her request had been denied.

Lewis raised the same claim in her state <u>habeas</u> petition. The Supreme Court ultimately rejected the claim on the pleadings, holding that Lewis failed to establish the requisite prejudice:

> The Court holds that claim (IV) does not satisfy the "prejudice" prong of the two-part test enunciated in <u>Strickland</u> . . . . Petitioner fails to allege that if she had been so advised, she would not have pleaded guilty and that her sentences would have been different if determined by a jury. In addition, petitioner advised the

39

circuit court that she understood that by pleading guilty she was waiving her right to a jury trial and that the trial judge would determine her sentences. Finally, in view of the overwhelming evidence of vileness in this case, petitioner has failed to demonstrate the likelihood that a jury would not have imposed sentences of death. Thus, petitioner has failed to demonstrate that there is a reasonable probability that, but for counsel's alleged errors, she would have pleaded not guilty, would have proceeded to trial, and the outcome of the proceedings would have been different.

Lewis III, 2007 Va. LEXIS 68, *2-3 (internal citations omitted).

In the instant petition, Lewis first argues that the Supreme Court of Virginia imposed a burden on her that is contrary to clearly established law. Specifically, Lewis contends that she is only required to show that, but for trial counsel's errors, she would have insisted on going to trial, and that the Supreme Court of Virginia erred in emphasizing that Lewis failed to demonstrate that her sentences likely would have been different had they been determined by a jury. For the following reasons, however, the court is unpersuaded by this argument.

In Hill v. Lockhart, 474 U.S. 52 (1985), the United States Supreme Court held that the two-part Strickland test "applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill, 474 U.S. at 58. Additionally, the Court clarified the appropriate prejudice inquiry for cases in which a defendant pleads guilty. Specifically, the Court stated that, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59. The Court then explained that, in many guilty plea cases, this inquiry "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." Id. For instance,

where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether

40

> the error "prejudiced" the defendant by causing him to plead guilty
> rather than go to trial will depend on the likelihood that discovery of
> the evidence would have led counsel to change his recommendation
> as to the plea. This assessment, in turn, will depend in large part on
> a prediction whether the evidence likely would have changed the
> outcome of a trial.

Id. at 59; see also Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (explaining that the inquiry as to whether there is a reasonable probability that, but for counsel's errors, the defendant would not have pled guilty, "is an objective inquiry, and dependent on the likely outcome of a trial had the defendant not pleaded guilty") (emphasis added) (internal citation omitted). Based on the foregoing, the court concludes that the Supreme Court of Virginia's application of Strickland was not contrary to clearly established law.

The court is also convinced that the Supreme Court's resolution of claim VI was not unreasonable. Given the substantial evidence against Lewis, as well as counsel's rational and informed expectation that the trial judge would not sentence Lewis to death, the court concludes that there is no reasonable probability that Lewis would have requested a jury determination of the aggravating factors, or that she would have proceeded to a jury trial if her request had been denied.

### D.    Claims IX and X

In her ninth claim, Lewis alleges that her indictment was constitutionally defective under Ring, because it did not charge the aggravating factors necessary to impose a death sentence. Lewis further alleges, in claim X, that trial counsel was ineffective in failing to adequately preserve her "indictment-related Ring rights." (Fed. Habeas Pet. at 83). When Lewis raised the same claims in her state habeas opinion, the Supreme Court of Virginia dismissed the claims on the merits, holding that "[a] defendant in a capital murder case does not have a constitutional right to be presented with

41

an indictment that contains the aggravating factors upon which a sentence of death may be imposed." Lewis III, 2007 Va. LEXIS 68, at *4 (internal citations omitted).

Because there is no United States Supreme Court precedent requiring the aggravating factors to be alleged in an indictment, the Supreme Court of Virginia's decision is clearly entitled to deference under § 2254(d). While Lewis cites to the United States Supreme Court's decision in Ring to support her indictment-related claims, that decision does not stand for the proposition that the aggravating factors must be charged in the indictment. To the contrary, the Ring Court specifically stated that the issue of whether the petitioner's indictment was constitutionally defective was not before it, and that the petitioner's "tightly delineated" claim alleged only that the Sixth Amendment required the jury to find the aggravating factors asserted against him. Ring, 536 U.S. at 597, n.4. Consequently, the Supreme Court of Virginia's adjudication of claim IX is entitled to deference, as is its adjudication of claim X. See Handsford v. Angelone, 244 F. Supp. 2d 606, 614 (E.D. Va. 2002) (holding that trial counsel cannot be ineffective for failing to raise a meritless argument).

### III. Claim that Lewis' constitutional rights were violated because the Supreme Court of Virginia failed to conduct a meaningful proportionality review (Claim VII)

In her seventh claim, Lewis alleges that the Supreme Court of Virginia failed to conduct a meaningful proportionality review of her death sentences on direct appeal, and that such failure entitles her to federal habeas relief as a violation of the Due Process Clause of the Fourteenth Amendment. For the following reasons, the court agrees with the respondent that this claim is without merit.[17]

---

[17] For the reasons stated with respect to claim VIII, infra, it appears that claim VII could be treated as procedurally defaulted on the basis that it was not properly presented in state court. However, because the respondent has not raised this particular procedural default argument, the court will address claim VII on the merits.

42

Under Virginia Code § 17.1-313, when a defendant has been convicted of a capital crime and sentenced to death, the Supreme Court of Virginia is required to determine "whether the sentence of death is excessive or disproportionate to the penalty in similar cases, considering both the crime and the defendant." Va. Code § 17.1-313(C)(2). In assessing whether the death sentence in question is disproportionate to the penalty imposed in other cases, the Supreme Court considers "whether 'juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes.'" Lewis I, 593 S.E.2d at 226 (quoting Wolfe v. Commonwealth, 576 S.E.2d 471, 490 (Va. 2003)).

In its review of Lewis' death sentences on direct appeal, the Supreme Court of Virginia considered the records of all capital murder cases reviewed by the Court, including cases in which the defendant received a life sentence. Id. The Supreme Court of Virginia also reviewed the records of all capital murder cases reviewed by the Court, in which the death penalty was imposed on the basis of murder for hire. Id. (citing Wolfe, supra; Williams v. Commonwealth, 472 S.E.2d 50 (Va. 1996); Murphy v. Commonwealth, 431 S.E.2d 48 (Va. 1993); Fisher v. Commonwealth, 374 S.E.2d 46 (Va. 1988); Stockton v. Commonwealth, 31 S.E.2d 371 (Va. 1984); and Clark v. Commonwealth, 257 S.E.2d 784 (Va. 1979)). Based on its review of the records from these cases, the Supreme Court ultimately concluded that the imposition of the death penalty in Lewis' case was neither excessive nor disproportionate to the penalty imposed in other cases:

> Even though the facts in all capital murder cases differ, we are confident that given the special heinousness associated with the murder for hire in this particular case, emphasizing that the defendant was the mastermind of the plan to kill her husband and stepson solely for greed and monetary gain, the sentences of death are neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in this Commonwealth for crimes of a similar nature considering the crime and the defendant.

Id.

The proportionality review conducted by the Supreme Court of Virginia is mandated by state statute, not the United States Constitution. Indeed, as the respondent emphasizes in response to this claim, states are not constitutionally required to provide proportionality reviews of death sentences imposed in capital cases. See Roach v. Angelone, 176 F.3d 210, 216 (4th Cir. 1999) (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1994)). Recognizing this "well-settled proposition," Id., Lewis contends that Virginia created a constitutionally protected liberty interest by electing to provide proportionality reviews, and that "subsequent state action with respect to that liberty interest must comport with the Due Process Clause of the Fourteenth Amendment," (Fed. Habeas Pet. at 70). Lewis further contends that the Supreme Court did not conduct a meaningful proportionality review in her case and, thus, that the Court violated her right to due process.

While Lewis suggests that the instant claim is a novel one, the Fourth Circuit rejected the same argument in Roach v. Angelone, supra. For the reasons set forth in Roach, Lewis' claim must also be dismissed. To support her claim, Lewis challenges the Supreme Court of Virginia's application of the state statute and asks this court to reexamine the Supreme Court's proportionality findings, neither of which is appropriate on federal habeas review. For instance, Lewis emphasizes that only two murder for hire cases in existence at the time of her appeal involved the imposition of the death penalty upon the hirer, and that if the Supreme Court had conducted a meaningful survey of those cases, the review would have indicated that Lewis should not have been sentenced to death. Additionally, despite the fact that the Supreme Court of Virginia has repeatedly rejected efforts by defendants to compare their sentences to those received by co-defendants, Lewis I, 593 S.E.2d at 227, Lewis argues that her sentence is disproportionate to the life sentences imposed upon Shallenberger and Fuller. Along the same lines, Lewis contends that a meaningful proportionality

44

review would have included a comprehensive comparison of sentences imposed on other defendants with similar IQ scores.

Lewis' allegations of inadequacy on the part of the Supreme Court of Virginia simply fail to provide a sufficient constitutional basis for federal habeas relief. As the Fourth Circuit emphasized in Roach, federal courts, on collateral review, "'are not required to re-examine a state court's good faith findings.'" Roach, 176 F.3d at 218 (quoting Buchanan v. Angelone, 103 F.3d 344, 351 (4th Cir. 1996)). Consequently, in the absence of any allegation or indication that the Supreme Court of Virginia engaged in its proportionality review in something other than "good faith," this court may not look behind its conclusion that the death sentences received by Lewis were not disproportionate to sentences imposed in similar cases. Id. Accordingly, Lewis' assertion of a due process violation in the proportionality review performed by the Supreme Court of Virginia is without merit, and claim VII must be dismissed.

### IV. Lewis' claim that the finding of vileness in her case was unconstitutional (Claim VIII)

In her next claim, Lewis argues that state courts' finding that she acted with depravity of mind was unconstitutional under Godfrey v. Georgia, 446 U.S. 420 (1980).[18] For the following reasons, the court concludes that this claim was not properly presented in state court, and that it is procedurally defaulted.

---

[18] In Godfrey, the jury was instructed that the defendant could be sentenced to death if the jury found, beyond a reasonable doubt, that the offense "was outrageously or wantonly vile, horrible, or inhuman in that it involved . . . depravity of mind." Godfrey, 446 U.S. at 422. Although the Godfrey Court upheld the instruction, it refused to uphold its application to Godfrey's case, and thus reversed the capital sentence that had been imposed upon Godfrey. Based on its review of the record, the Court concluded that Godfrey's crimes could not "be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder." Id. at 433.

45

While Lewis contends that she properly raised this constitutional claim on direct appeal, the record does not support this contention. On direct appeal, Lewis argued that the evidence was insufficient to support the trial court's finding of vileness under state law definitions. (Lewis v. Commonwealth, Va. Sup. Ct. Record No. 032153, Opening Br. at 14-18, Reply Br. at 7). Lewis did not cite Godfrey or otherwise allege that the trial court's finding of vileness rose to the level of a federal constitutional violation. See Thomas v. Taylor, 170 F.3d 466, 470 (4th Cir. 1999) (holding that petitioner's federal constitutional claim was procedurally defaulted, since he only asserted a violation of state law on direct appeal, without asserting that his federal constitutional rights were violated). Although Lewis did raise the constitutional argument in her petition for rehearing, a petition for rehearing may not present new issues that were not previously raised on appeal. See Orbe v. True, 601 S.E.2d 547, 551 (Va. 2004) (holding that Orbe was barred from advancing new federal constitutional issues in his petition for rehearing that were not raised in his petition for appeal). Consequently, the Fourth Circuit has held that "[r]aising a claim in a petition for rehearing does not fairly present the claim to the state's highest court." Hedrick v. True, 443 F.3d 342, 365 n.1 (4th Cir. 2006).

The court also rejects Lewis' argument that the constitutional claim was adequately presented during the state habeas proceedings. As previously stated, Lewis initially filed a 112-page state habeas petition. Under Rule 5:7A of the Rules of the Supreme Court of Virginia, state habeas petitions in death penalty cases are limited to 50 pages, unless permission for a longer petition is granted by a justice of the Court. The Supreme Court of Virginia denied Lewis' accompanying motion for permission to file a longer habeas petition, and directed her to file a 50-page petition. Although Lewis had included the constitutional claim under Godfrey in her initial petition, she did not raise the claim in her 50-page petition, the only habeas petition accepted for consideration by the

46

Supreme Court of Virginia. After filing the 50-page petition as directed by the Supreme Court, Lewis filed a motion to amend, in which she sought to reintroduce claims that had been omitted from the shortened petition, including the claim under Godfrey. Lewis' motion was opposed by the respondent, who argued that granting the motion to amend would render meaningless the page limit imposed by Rule 5:7A. The Supreme Court of Virginia ultimately denied Lewis' motion to amend, and did not address the merits of any of the claims presented by Lewis in that motion. Because Lewis' Godfrey claim was never presented to the Supreme Court of Virginia in compliance with the page limit established by Rule 5:7A, the court agrees with the respondent that this claim was not fairly presented in state court, and that it is procedurally defaulted. See Orbe v. True, 233 F. Supp. 2d 749, 764 (E.D. Va. 2002) (holding that certain claims were procedurally defaulted, since the petitioner failed to include them in his 50-page petition).

In her reply brief, Lewis argues that cause and prejudice exist to excuse her default, in that the page limitation imposed by the Supreme Court of Virginia impeded her ability to raise all of her habeas claims. This argument, however, is also unpersuasive. In Weeks v. Angelone, 176 F.3d 249 (4th Cir. 1999), the Fourth Circuit squarely rejected the petitioner's argument that a page limitation imposed by the Supreme Court of Virginia provided cause to excuse the petitioner's procedural default. The Court emphasized that "[w]hile the page limitation [for briefs on direct appeal] may have led [petitioner's] counsel to make certain strategic choices as to which arguments to include and which to omit," Weeks, 176 F.3d at 272, "it did not wholly prevent him from presenting them," Id. at 271. Because Lewis offers no compelling basis to distinguish between page limitations imposed on appellate briefs and those imposed on state habeas petitions in capital cases, the court

47

concludes that she has not shown cause to excuse her procedural default. Consequently, claim VIII must be dismissed.[19]

## V.     Claim of actual innocence (Claim XI)

In her eleventh claim, Lewis asserts that she did not hire Shallenberger or Fuller to kill Julian or C.J and, thus, that she is actually innocent of the murder for hire charges. To support this claim, Lewis states, in a footnote, that "Shallenberger admitted to [habeas counsel's] investigators (one a lawyer) that the idea to kill Teresa's husband and stepson was his, not Teresa's and that he and Teresa never discussed Teresa paying him for any killing." (Fed. Habeas Pet. at 84, n.58).

Lewis raised the same claim in her state habeas petition. The Supreme Court of Virginia dismissed the claim on the merits, holding that the claim was outside the scope of state habeas review. Lewis III, 2007 Va. LEXIS 68, at *11 (citing Lovitt v. Warden, 585 S.E.2d 801, 827 (Va. 2003)). For the following reasons, the court agrees with the respondent that Lewis' claim of actual innocence also fails to provide a basis for federal habeas relief.

As the Fourth Circuit observed in Buckner v. Polk, 453 F.3d 195 (4th Cir. 2006), the United States Supreme Court "has strongly suggested that claims of actual innocence standing alone do not serve as an independent basis for habeas relief." Buckner, 453 F.3d at 199. Indeed, in Herrera v. Collins, 506 U.S. 390 (1993), the Supreme Court emphasized that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal

---

[19] The court notes that, even if this claim was not procedurally defaulted, it would nonetheless be subject to dismissal on the merits. Having reviewed the record, the court concludes that, unlike Godfrey's case, the evidence against Lewis was sufficient to establish that her actions "reflected a consciousness materially more 'depraved' than that of any person guilty of murder." Godfrey, 446 U.S. at 433.

48

proceeding."[20] Herrera, 506 U.S. at 400. Nonetheless, even if the court assumes "for the sake of argument . . . that . . . a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional," Herrera, 506 U.S. at 417, the hearsay evidence proffered by Lewis falls far short of the "extraordinarily high" showing that would be required to support such claim. See Id. (holding that certain hearsay statements were insufficient to support the petitioner's freestanding claim of actual innocence). Accordingly, claim XI must also be dismissed.

## VI.  Claim that counsel failed to adequately investigate or challenge the "murder for hire elevator" (Claim XII)

Lewis next alleges that trial counsel failed to adequately investigate whether or not there was sufficient evidence to convict her of murder for hire. While Lewis acknowledges that the evidence included her own statements to the police, she now contends that her statements were not reliable in light of her borderline intellectual function, and that they, at most, suggested that Lewis "simply expected to share any proceeds of the murders with [Shallenberger] as partners in a relationship." (Pet.'s Reply Br. at 30).

Lewis raised the same claim of ineffective assistance in her state habeas petition. The Supreme Court of Virginia ultimately held that Lewis failed to establish the requisite prejudice. Based on the fact that "Lewis' confession was corroborated by testimony of Rodney L. Fuller, another perpetrator, and by evidence that Lewis paid Shallenberger the contents of her husband's wallet after Shallenberger carried out the murder plan," the Court concluded that Lewis "failed to

---

[20] Relying on Herrera, the Fourth Circuit previously noted, in Rouse v. Lee, 339 F.3d 238 (4th Cir. 2003), that "claims of actual innocence are not grounds for habeas relief even in a capital case." Rouse, 339 F.3d at 255.

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 49 of 53   Pageid#: 362

demonstrate that there is a reasonable probability that, but for counsel's alleged errors, she would have pleaded not guilty" and would have proceeded to trial. Lewis III, 2007 Va. LEXIS 68, at *7-8.

Having reviewed the record, the court concludes that the Supreme Court of Virginia's decision with respect to this claim was not based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. As the Supreme Court indicated in its decision on direct appeal and its opinions on Lewis' state habeas claims, Lewis confessed that she had offered Shallenberger money to kill her husband, and the court is unpersuaded by Lewis' present assertion that her confession was somehow coerced or involuntary. Indeed, the recorded conversations with investigators included one from November 8, 2002, when Investigator Keith Isom met with Lewis at her own request. During the recorded conversation, Lewis told Isom that she had agreed to give Shallenberger part of the insurance money (Direct Appeal J.A. at 549, 564), and that Shallenberger planned to meet Lewis a week after the murders to "talk about the money" (Direct Appeal J.A. at 562). Additionally, it is undisputed that, after Julian was shot, Lewis retrieved Julian's wallet from the couple's bedroom and gave Shallenberger cash from the wallet. While Lewis now argues that such evidence is insufficient to establish that Shallenberger was actually hired by Lewis, and that counsel rendered ineffective assistance by failing to challenge the sufficiency of the evidence, the court is convinced that the Supreme Court of Virginia's adjudication of this claim is entitled to deference under § 2254(d).[21]

---

[21] While Lewis also argues that she is entitled to an evidentiary hearing with respect to this claim, the court disagrees. The court is convinced that, even with the benefit of an evidentiary hearing, Lewis could not establish that the Supreme Court of Virginia's adjudication of this claim was based on an unreasonable application of federal law or an unreasonable determination of the facts. See Schriro, 127 S. Ct. at 1940 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.").

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 50 of 53   Pageid#: 363

**VII.    Claim that the trial court violated her constitutional rights by failing to conduct a separate evaluation as to whether death was appropriate (Claim XIII)**

In her thirteenth claim, Lewis contends that the Circuit Court violated her constitutional right to a fair trial by failing to conduct the appropriate inquiry when determining whether to impose the death penalty. According to Lewis, the determination of whether a defendant should be sentenced to death is a two-step process, in which the judge or jury must first consider the aggravating factors, and then consider what the appropriate sentence should be in light of the mitigating evidence.

Lewis raised the same claim in her state habeas petition. The Supreme Court of Virginia ruled that it was procedurally barred, since she failed to raise it at trial or on direct appeal. Lewis III, 2007 Va. App. 68, at *11-12 (citing Slayton, 205 S.E.2d at 682).

In the instant petition, Lewis attempts to establish cause for her procedural default on the basis of ineffective assistance. Specifically, Lewis asserts that "[h]ad trial counsel properly preserved this issue and raised it on direct appeal, there is a reasonable probability that [her] death sentence would have been reversed." (Fed. Habeas Pet. at 92-93). The problem with this argument, however, is that Lewis did not assert it in her 50-page state habeas petition. Instead, Lewis merely included a footnote which read, in its entirety, as follows: "Trial counsel's failure to preserve and assert the substantive Claims XI through XVI is incorporated in each such Claim and precludes any finding of waiver or default by Teresa." The court agrees with the respondent that this footnote did not preserve the instant federal claim of ineffective assistance and, thus, that the ineffective assistance claim is also procedurally defaulted. See Edwards, supra (holding that a claim of ineffective assistance generally must be presented as an independent claim in state court before it may be used to establish cause for a procedural default).

51

In her reply brief, Lewis attempts to demonstrate cause and prejudice for her procedural default of the ineffective assistance claim by pointing to the page limitation imposed by Rule 5:7A of the Rules of the Supreme Court of Virginia. As previously explained with respect to claim VIII, however, the court is unpersuaded by this argument. Accordingly, claim XIII must be dismissed.[22]

### VIII. Claim that trial counsel failed to adequately advise her on the decision to plead guilty (Claim XIV)

In her next claim of ineffective assistance, Lewis argues that trial counsel failed to adequately advise her on the decision to plead guilty and to waive her right to a jury trial. Specifically, Lewis contends that counsel failed to advise her that she might not be eligible for the death penalty if a judge or jury determined that she was mentally retarded, or that a "strong case in mitigation could be presented." (Fed. Habeas Pet. at 93). Lewis further contends that, had she been informed of such facts, there is a reasonable probability that she would have insisted on going to trial.

Lewis raised the same claim in her state habeas petition. Applying Strickland and Hill, supra, the Supreme Court of Virginia found that the habeas record failed to demonstrate the requisite prejudice. In light of Lewis' confession, which included a detailed explanation of her extensive role in planning and carrying out the two murders, the Supreme Court concluded that there was no reasonable probability that Lewis would have pleaded not guilty, had her trial counsel developed additional mitigation evidence. Additionally, as the Supreme Court emphasized in its decision, the Commonwealth could have rebutted the additional mitigation evidence cited by habeas counsel "with expert testimony that Lewis did not suffer from a dependent personality disorder, was not addicted to drugs, and had the cognitive ability to plan and execute the murders." Lewis II, 645 S.E.2d at 507.

---

[22] The court notes that this claim would nonetheless be subject to dismissal on the merits, even if it was not procedurally defaulted. Simply stated, the record belies petitioner's assertion that the trial court automatically sentenced her to death without considering any of the mitigation evidence.

Case 7:07-cv-00538-GEC-mfu   Document 21   Filed 03/06/09   Page 52 of 53   Pageid#: 365

In the absence of any evidence that Lewis met the statutory standard for mental retardation, the Supreme Court also properly concluded that Lewis was not prejudiced by trial counsel's alleged failure to inform her that a finding of mental retardation would prevent her from receiving a death sentence. In sum, the Supreme Court's decision with respect to claim XIV is clearly entitled to deference under § 2254(d).

### IX. Claim regarding the cumulative impact of trial counsel's performance (Claim XV)

In her final claim, Lewis contends that her individual claims of ineffective assistance of counsel, considered cumulatively, demonstrate that her trial counsel's overall performance and the resulting prejudice violated her constitutional rights. This claim may be summarily dismissed.

The Fourth Circuit has made clear that claims of ineffective assistance must be reviewed individually, rather than collectively. See Fisher v. Angelone, 163 F.3d at 852-853. The court has thoroughly reviewed each of Lewis' individual claims, and has found that none of them provide a basis for federal habeas relief. Accordingly, Lewis' claim of cumulative error is also subject to dismissal.

## Conclusion

For the reasons stated, the respondent's motion to dismiss will be granted and the petitioner's request for an evidentiary hearing will be denied. The Clerk is directed to send certified copies of this opinion and the accompanying order to all counsel of record.

ENTER: This 6th day of March, 2009.

_____
United States District Judge

53